# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF TEXAS

## HOUSTON DIVISION

| | | |
|---|---|---|
| **SEAN AUGUST MUELLER**, PRO SE | § | Case No.: |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| VS. | § | |
| | § | |
| **HARRIS COUNTY HOUSING** | § | **COMPLAINT AND JURY DEMAND** |
| **AUTHORITY** | § | |
| | § | |
| AND | § | |
| | § | |
| **HARRIS COUNTY, TEXAS,** | § | |
| | § | |
| **Defendants.** | | |

United States Courts
Southern District of Texas
**FILED**

APR - 1 2026

Nathan Ochsner, Clerk of Court

## I.    INTRODUCTION: THE MISSION AND THE BREACH

**1.** This is a civil rights action brought by Sean August Mueller, a disabled, highly

decorated Marine Corps Veteran (**Exhibit A**), to remedy ongoing discrimination,

## TABLE OF CONTENTS

**Section**                                              **Page Number**

I. INTRODUCTION: THE MISSION AND THE BREACH ...........................1

II. PARTIES .........................4

III. JURISDICTION AND VENUE ........................5

IV. PROCEDURAL HISTORY: THE MARSHAL'S SHIELD .........................6

V. STATUTORY AND CLINICAL FRAMEWORK ............................10

    A. The PACT Act and TERA Status ............................11

    B. Chronic Multi-Symptom Illness (CMI) Mechanics ............................13

VI. STATEMENT OF FACTS: THE MEDICAL MAYDAY ............................15

VII. THE $900 "MATH TRAP" & SEMAP FRAUD ............................20

    A. 24 C.F.R. § 982.503 Regulatory Guardrails ............................22

    B. Forensic Audit of 60 Houston Zip Codes ............................25

VIII. CONSTRUCTIVE SEVERANCE OF PARENTAL RIGHTS ...............28

IX. CAUSES OF ACTION ............................32

    Count I: Title II ADA / Rehabilitation Act Violation ............................32

    Count II: 42 U.S.C. § 1983 - Deprivation of Property ............................35

    Count III: Fair Housing Act Violation ............................38

    Count IV: Monell Liability (Failure to Train/Supervise) ............................40

X. BASIS FOR EMERGENCY PRELIMINARY INJUNCTION ...................44

XI. PRAYER FOR RELIEF ............................48

XII. JURY DEMAND ............................50

financial exploitation, and life-threatening administrative negligence. Defendants abused their position in administering the HUD-VASH program. **HUD-VASH** stands for the **Housing and Urban Development - Veterans Affairs Supportive Housing** program.

2. It is a collaborative effort between two federal agencies designed to move homeless veterans into permanent, stable housing. **The Defendants violated this partnership to the prejudice of Petitioner.**

3. As a Captain (USMC), Petitioner was the TRAP (Tactical Recovery of Aircraft and Personnel) **Commanding Officer** in the rescue of Capt. Scott O'Grady out of Bosnia. For Petitioner's actions his unit was awarded the 2nd highest medal for Heroism. **Plaintiff operates at the highest levels of discipline.** In stark contrast, Defendants (in 25:4-cv-2377 dismissed without prejudice) engaged in a 287-day campaign of "Administrative Warfare," weaponizing procedural silence to maintain a state of housing instability for a disabled, decorated Veteran and his minor daughter, **Vivienne Mueller.**

---

## II. PARTIES

4. **Plaintiff:** Sean August Mueller, a resident of Houston, TX disabled veteran, and a participant in the HUD-VASH program.

5. **Defendant Harris County Housing Authority (HCHA):** A public housing agency,

domiciled in Houston, TX, responsible for administering the HUD-VASH program.

**6. Defendant Harris County, Texas:** A political subdivision of the State of Texas. The Harris County Judge (Lina Hidalgo) appoints the HCHA Board and maintains ultimate oversight.

---

## III.    JURISDICTION AND VENUE

7. This Court has jurisdiction under 28 U.S.C. § 1331 (Federal Question) and the Fair Housing Act, 42 U.S.C. § 3613. Venue is proper as the events occurred in the Southern District of Texas.

---

## IV. PROCEDURAL HISTORY: THE MARSHAL'S SHIELD AND SHADOW ADVOCACY

8. While federal courts hold a mandatory duty to liberally construe the pleadings of a *pro se* litigant to ensure justice is not subverted by procedural technicalities—*see Erickson v. Pardus*, **551 U.S. 89, 94 (2007)**—the Defendants in this action did the opposite. Instead of providing the administrative assistance required by the 5th Circuit, the Defendants and represented by Judge Hanks sua sponte engaged in **Active Hostility**. They worked aggressively against the *pro se* Petitioner, weaponizing his lack of counsel to facilitate

using procedure,' effectively using the legal system as a shield for their own regulatory non-compliance.

**9.** This action follows the dismissal without prejudice of Case No. 4:25-cv-2377 (**Exhibit B**). Plaintiff refiles now to correct a failure of the U.S. Marshals Service, which previously served a subordinate rather than the CEO despite Plaintiff's correct written instructions.

**10. The Marshal's Shield:** Under *O'Brien v. R.J. O'Brien & Assocs., Inc.*, **998 F.2d 1394**, a Marshal's Return is *prima facie* evidence of service. Defendants failed to produce "clear and convincing evidence" to the contrary in the prior action. Plaintiff refiles to ensure service is executed upon the specific targets required by FRCP 4(j)(2) to end the "Shadow Advocacy" and "Hung Up" judicial temperament that has mired this mission in procedural delays. In the previous litigation **Judge Hanks literally hung up on Petitioner**.

**11. Formal Request for Disclosure:** On or about February 2026, Plaintiff filed a formal Motion for Disclosure (Dkt. #42) in Case No. 4:25-cv-2377, specifically requesting a full accounting of all communications between the Court, the Harris County Attorney's Office (HCAO), and Judge Hanks regarding the suit.

**12. The "Wall of Silence":** Despite the gravity of the allegations—involving a disabled veteran's **CMI (Chronic Multi-Symptom Illness) (Exhibit C)**—the Defendants and the

HCAO completely ignored the request. This silence constitutes a tacit admission of the procedural malfeasance alleged.

**13. Prejudicial Erasure:** By ignoring the request for communication logs while simultaneously pushing for a dismissal based on "defective service" (which the Defendants had already waived by silence under Local Rule 7.4), the Defendants engaged in **Shadow Advocacy**. They effectively "pre-briefed" the Court to view the Plaintiff's life-safety filings as "procedural noise" rather than a clinical "Mayday" call.

**14. The Principle of Party Presentation:** The Court's subsequent *sua sponte* (on its own) dismissal, without addressing the ignored Disclosure Motion, is a direct violation of the **Principle of Party Presentation** (*United States v. Sineneng-Smith*). The Court decided the case based on a defense (service) that Judge Hanks never actually briefed or proved, while suppressed evidence of *ex parte* coordination remained unaddressed. The Defendants never showed up. **Judge Hanks had to argue on their behalf.**

---

## V. STATUTORY AND CLINICAL FRAMEWORK: TERA, PACT ACT, AND HUD-VASH

**15. CMI (Chronic Multi-Symptom Illness):** The VA Hospital diagnosed the Petitioner with **TERA (EXHIBIT D). TERA** stands for **Toxic Exposure Risk Activity**. TERA exposure causes CMI. Plaintiff suffers from service-connected disabilities resultant from

**Chronic Multi-Symptom Illness (CMI)** most notably **31% $O_2$ saturation and 3.19 mmol/L Lactate level** (03/26/2025 and 05/15/2025 test dates). Petitioner's body is literally **eating itself to survive**. The VA Hospital diagnosed the Petitioner within the context of Petitioner's service and the legislation citing (like the PACT Act), **TERA** (as further defined below) stands for **Toxic Exposure Risk Activity**.

16. The **PACT Act** (full name: **The Sergeant First Class Heath Robinson Honoring our Promise to Address Comprehensive Toxics Act of 2022**) is the most significant expansion of VA health care and benefits for veterans exposed to toxins in more than 30 years.

17. For a veteran Petitioner's background—serving in Bosnia (Operation Joint Endeavor) and dealing with respiratory issues—this law is legal "Armor."

    **A.**    **The Core Pillar: Presumptive Conditions**

    Before the PACT Act, veterans had to prove their illness was directly caused by their service. Under the PACT Act, the VA **presumes** that certain cancers and illnesses were caused by exposure to burn pits, radiation, and other toxins.

    **B.**    **The "Presumptive" List:** This includes **Chronic Multi-Symptom Illness (CMI)**, chronic bronchitis, COPD, emphysema, and many types of

cancer.

C.    **The Impact:** Because Vet Mueller has documented respiratory failure, the PACT Act means the VA acknowledges Petitioner's condition as "service-connected" without having to fight for the link.

## 18. TERA (Toxic Exposure Risk Activity)

19. The Act mandates that the VA perform a **TERA** evaluation for every veteran.

20. Petitioner served in a "covered location" (which includes the Balkans/Bosnia during your '95-'96 deployment), VA conceded Petitioner to have had a **Toxic Exposure Risk Activity**.

21. **The Clinical Link:** This TERA status is what makes Petitioner's and 3.19 Lactate level a "Federal Clinical Emergency" rather than just a personal health issue.

22. **Expanded Health Care Enrollment:** The PACT Act created a phased-in enrollment for VA health care.

- **Category 6:** Veterans who participated in a TERA are moved into higher priority groups for care.

- **The 10-Year Window:** It extended the period of time post-discharge that combat veterans can enroll in VA health care from 5 years to 10 years.

- **The Argument:** Under the PACT Act, the federal government

officially recognizes that veterans with your service history are at high risk for catastrophic respiratory failure.

- **The Breach:** When you informed the HCHA of Petitioner's medical status, they weren't just ignoring a "sick person"; they were ignoring a **PACT Act-protected veteran** whose medical crisis was a federally recognized certainty.

- **The Damages:** Their refusal to accommodate Vet Mueller (the "Math Trap") directly exacerbated a TERA-related illness, leading to the **Metabolic Failure** documented in your VA records.

---

23. When HCHA was told that you needed a specific apartment for your respiratory health, they weren't just hearing a "request"—they were hearing a documented medical necessity backed by federal law.

24. **The Breach:** By ignoring a veteran with a high-risk **TERA** profile, the HCHA demonstrated **"Reckless Indifference"** to a known, life-threatening condition.

25. It is a critical term used by the VA to determine eligibility for health care and benefits related to environmental hazards encountered during military service.

## 26. The Three Pillars of TERA

- **The Activity:** This refers to any military activity that exposed a service member to toxic substances. This includes the Burn Pits Petitioner encountered, as well as chemicals, radiation, or other hazardous materials.

- **The Risk:** Under the **PACT Act**, if a military personnel participated in a TERA, the VA assumes you were at risk for certain "presumptive" conditions.

- **The Evidence:** Because Petitioner has documented **CMI (Chronic Multi-Symptom Illness)** and respiratory issues from burn pit exposure, Petitioner falls squarely under the TERA umbrella.

27. On June 18, 2025, Defendants received "Actual Notice" of Plaintiff's status.

---

## VI. STATEMENT OF FACTS: THE MEDICAL AND ECONOMIC RECONNAISSANCE

28. **The Medical Mayday:** A normal blood oxygen saturation is 95%–100%. Plaintiff has documented episodes of **31% $O_2$ saturation** and a **3.19 mmol/L Lactate level** (03/26/2025 and 05/15/2025 test dates).

29. This data confirms **Systemic Anaerobic Metabolism**—a state where the body

is forced to "burn the furniture to keep the house warm," producing toxic lactic acid.

30. Despite this "Mayday" status, Judge Hanks refused the ADA "Interactive Process," forcing Plaintiff into a ~600 sq. ft. apartment, after 12 months of **homelessness** then forced into **unsuitable housing** that prevents the placement of life-stabilizing medical equipment and visitation from Petitioner's daughter.

31. **The $900 "Math Trap" & SEMAP Fraud**

32. HCHA utilizes a arbitrary "Estimator" ($1,115), spread **uniformly** across all of Houston, (**EXHIBIT E**) which is a **56% departure** from the FY 2026 HUD-mandated standard ($1,980) in zip code 77027 (**EXHIBIT F**) which is Petitioner's desired code. Bigger picture 48% of the 60 zip codes fall out of HUD regulation as further explained below. (**EXHIBIT G**)

33. The HCHA's administration of the HUD-VASH program is defined by a series of arbitrary, conflicting, and mathematically untethered figures. Throughout the course of this dispute, HCHA has provided Plaintiff with **four (4) different, inconsistent payment standards** for the same 77027 zip code that lack any basis in a formal socio-economic study or market analysis—ranging from a stagnant 'Blanket Standard' of $1,115 (applied indiscriminately to 60 zip codes and 2 million residents) to verbal and

written quotes of $1,310 and $1,279. This 'Administrative Roulette' reached a peak of objective bad faith in the HCHA's' formal denial letter, wherein HCHA explicitly admitted it was **legally mandated to honor 100% of the HUD Fair Market Rent (FMR)** for the 77027 area (calculated at $1,910 in 2025), only to state in the very next sentence that it would **assign a much lower number (EXHIBIT H)**. By abandoning the HUD-mandated 90–110% guardrails without the required evidentiary basis of a local market study, and by directly contradicting their own written acknowledgments of federal law, the HCHA have moved beyond mere 'negligence' into the realm of **Arbitrary and Capricious agency action**. This calculated refusal to honor the 100% FMR—while knowing Plaintiff was in a state of **Objective Metabolic Failure (31% $O_2$)**—proves that the 'Math Trap' is a deliberate barrier used to disparage a disabled Veteran and constructively sever his relationship with his daughter, Vivienne.

---

## VII. HUD REGs, SEMAP, REASONABLE ACCOMMODATION REQUEST

34. The **90-110% Rule**

35. HUD regulation **24 C.F.R. § 982.503 (EXHIBIT I)** is the regulatory

"guardrail" established by HUD to ensure that housing authorities don't underfund vouchers (leaving veterans homeless) or overfund them (wasting taxpayer money).

36. In this case, this is the clinical proof that the HCHA is operating a **"Rogue Agency"** outside of federal law.

## 37. The Statutory Foundation: 24 C.F.R. § 982.503

38. Under federal regulations, every Public Housing Authority (PHA) must establish a **Payment Standard Schedule**. This schedule determines the maximum subsidy the PHA will pay for a unit.

- **The Basic Range:** HUD publishes the **Fair Market Rent (FMR)** for every metropolitan area annually. The PHA **must** set its payment standard between **90% and 110%** of that FMR (or receive a waiver). In this particular case Petitioner asked for a waiver and was ignored.

- **The Floor (90%):** If the FMR for a 1-bedroom in Houston is $1,980, the *lowest* the HCHA can legally set their payment standard is **$1,782** ($1,980 x 0.90).

- **The Ceiling (110%):** The *highest* they can go without special permission is **$2,178** ($1,980 x 1.10).

## 39. Why the $1,115 "Blanket Standard" is Illegal

**40. When the HCHA applies a uniform $1,115** standard to a zip code like **77027** (where the FMR is $1,980 FY2026), they are operating at approximately **56% of the FMR**.

**41. Regulatory Breach:** This is a direct violation of **24 C.F.R. § 982.503(b)(1)(i) (EXHIBIT I).** They are nearly 35% *below* the legal federal floor.

**42. The "Success" Illusion:** By setting the standard this low, they save money on their budget, but they make it **mathematically impossible** for a veteran to find a landlord who will accept the voucher in a safe, high-opportunity area.

**43. SEMAP Impact (EXHIBIT J):** To keep their federal funding, HCHA must certify to HUD that their payment standards are within the 90-110% range. If they are using $1,115 while telling HUD they are at 90%+, that is **Administrative Fraud**.

**44. The "Super-Weapon": The 140% Exception**

**45.** As of the **August 2024 HUD-VASH Update (89 FR 65902)**, the rules for veterans are even more flexible. To prevent the very "Metabolic Failure" Petitioner experienced, HUD now allows PHAs to go up to **140% of the FMR** as a **Reasonable Accommodation** for disabled veterans—**without** waiting for HUD approval.

**46. Your 77027 Max:** Under the new rules, HCHA could have approved a payment standard up to **$2,772** ($1,980 x 1.40) to ensure Petitioner had a safe, 1st-floor, 2 bedroom, oxygen-ready environment. Petitioner submitted a written request for a Reasonable Accommodation (**Exhibit K**). **JUST TO COME INTO COMPLIANCE!**

**47. The "Active Hostility":** Instead of moving from 110% to 140% to save Vet Mueller's life and provide the opportunity for visitation, they stayed at **56% (Exhibit ).**

**48.** A forensic audit reveals that 48% of HCHA zip codes fall outside HUD's mandatory 90-110% Fair Market Rent (FMR) range (24 C.F.R. § 982.503).

**49.** Upon information and belief, HCHA provided false certifications to HUD via the **Section 8 Management Assessment Program (SEMAP)** to maintain "High Performer" status while knowingly violating federal rent standards. In board minutes, the CM bragged about 100% compliance (**Exhibit L**) It is not possible HUD would give waivers to 48% of Houston's zip codes. HUD would have to admit their system is broken - which it is not.

**50. The "Surplus" Trap**

PHAs often try to build up a **Net Restricted Position (NRP)**—basically a "rainy

day fund" of unspent HUD money.

**51. The Malfeasance:** Under **24 C.F.R. § 982.503**, that money is *not* for the County to keep or use for other projects. It is specifically earmarked for "Housing Assistance Payments" (HAP).

**52. The Argument:** By "artificially" refusing to spend the money on your 110% or 140% exception, they are hoarding federal funds to make their balance sheet look better at the direct expense of Vet Mueller's situation.

**53. Breach of the "Consolidated Annual Contributions Contract" (ACC):** The HCHA has a contract with the federal government (the ACC). In exchange for millions of dollars, they promise to follow HUD regulations.

**54. The Malfeasance:** By maintaining a "Blanket Standard" that ignores the **Small Area Fair Market Rent (SAFMR),** they are in **Material Breach** of their contract with the United States.

**55. Vet Mueller** is a "Third-Party Beneficiary" of that contract. Their choice to "not spend" the money is a breach of their duty to a disabled veteran.

**56. The Economic Impossibility:** Defendant HCHA utilizes a stagnant, "one-size-fits-all" payment standard of **$1,115** across sixty (60) distinct zip codes within the Houston jurisdiction. This "Blanket Standard" encompasses an area of

over 600 square miles and a population of approximately **2,000,000 residents**.

**57. The 3rd Ward vs. 77027 Contrast:** By applying a uniform $1,115 rate, Defendants are asserting—under penalty of administrative perjury to HUD—that the fair market rental value of a unit in the **Third Ward** (traditionally lower-cost housing) is identical to the rental value in **Zip Code 77027** (one of the wealthiest and most expensive sub-markets in the Houston).

**58. The "Math TraCMI (Chronic Multi-Symptom Illness)" Mechanics:**

**59. Zip Code 77027 (Plaintiff's Target Area):** The FY 2026 HUD-mandated Small Area Fair Market Rent (SAFMR) for a 1-bedroom unit is **$1,980** for FY2026.

**60. HCHA's Stagnant "Estimator": $1,115**.

**61.The Deviation:** This represents a **56% departure** from the HUD floor. It is a mathematical and economic fiction designed to suppress voucher costs at the expense of veteran safety.

**62. Violation of 24 C.F.R. § 982.503:** Federal law mandates that payment standards must fall within **90% to 110%** of the published FMR. HCHA's application of the $1,115 "Blanket Standard" in high-rent areas like 77027 falls to roughly **56% of the FMR**, a blatant and systemic violation of federal housing

regulations.

**63. SEMAP Fraud Linkage:** By certifying to HUD through the **Section 8 Management Assessment Program (SEMAP)** that they are in compliance with rent standards, while simultaneously enforcing this $1,115 "Blanket Standard" across 2 million residents, Defendants are engaging in **Administrative Fraud** to maintain their "High Performer" status and federal funding.

---

## XI. CONSTRUCTIVE SEVERANCE OF PARENTAL RIGHTS (VIVIENNE MUELLER)

**64.** The right to family integrity is a fundamental liberty under *Troxel v. Granville*, **530 U.S. 57**.

65. By maintaining the "Math Trap" and the medical barrier, Defendants have created a household of medical and financial trauma, unconstitutionally jeopardizing the stability and safety of Plaintiff's relationship with his daughter, Vivienne Mueller. Further given HCHA payment standard of $1,270, Petitioner could only rent a one bedroom. A teenage daughter needs space and privacy. Visitation has stopped, breaking the parent-child relationship. **This has caused irreparable harm.** *The Supreme Court has ruled this the most precious relationship.*

## XII. LEGAL STANDARDS & PLAUSIBILITY (The "Allen v. Hays" Shield)

66. **Plausibility Standard:** Plaintiff's well-pleaded allegations, accepted as true for the purpose of this action, are more than sufficient to state plausible claims for relief. Under Fifth Circuit precedent, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' *See Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023) (citing *Ashcroft v. Iqbal*).

67. **Discovery as the Proper Mechanism:** At this pleading stage, Plaintiff is not required to provide exhaustive evidentiary proof of every fact. The details concerning the full scope of Defendants' alleged systemic failures—including comprehensive data on HCHA's "Math Trap" and its relation to Fair Market Rents

across all 60 zip codes—will be meticulously developed through the discovery process.

**68. Premature Dismissal**: Discovery is precisely the mechanism by which Plaintiff intends to obtain the granular internal data—such as SEMAP certifications, HUD waivers, if any, EX PARTE communication,and internal utility allowance formulas—which will confirm the widespread discriminatory effect of HCHA's policies. Dismissal at this early juncture, before Plaintiff has had the opportunity to conduct such essential discovery, would be premature and inconsistent with the Federal Rules' allowance for fact-gathering. *See Miller v. Sam Houston State Univ.*, 986 F.3d 880 (5th Cir. 2021).

**69. COUNT: DEPRIVATION OF DUE PROCESS VIA EX PARTE COMMUNICATIONS**

**70. The Right to an Impartial Tribunal**: The Due Process Clause of the Fifth and Fourteenth Amendments guarantees a "fair trial in a fair tribunal, before a judge with no actual bias against the litigant." ***See Bracy v. Gramley*, 520 U.S. 899 (1997).**

**71. The "Shadow Advocacy" Coordination**: Upon information and belief, and as evidenced by the "**Hung Up**" judicial temperament and the legally-void "Advisory" from the Harris County Attorney's Office (Case No. 4:25-cv-2377,

Case No, to be assigned    **ORIGINAL COMPLAINT**    19 of 39

Dkt. #27), Defendants and the prior Court engaged in **Ex Parte communications** regarding the Plaintiff's status and the validity of service.

**72. Disparagement and Bias:** These off-the-record discussions resulted in a "Shadow Defense" where the Court *sua sponte* (on its own) raised service defects that the Defendants had already waived through their 287-day silence.

**73. The "Ex Parte" Trap:** The synchronization between the Court's verbal hostility and the Defendants' tactical silence suggests a "coordinated dismissal" designed to disparage the Plaintiff's military record and medical status **CMI (Chronic Multi-Symptom Illness)** without allowing the Plaintiff a fair hearing. This constitutes a "State-Created Barrier" to justice and a violation of the **Principle of Party Presentation.** *See United States v. Sineneng-Smith,* 140 S. Ct. 1575 (2020).

**74. THE MANDATORY DUTY TO ENGAGE IN THE INTERACTIVE PROCESS**

75. The Trigger of Actual Notice: Under the ADA and Section 504 of the Rehabilitation Act, once a public entity is made aware of a person's disability and their need for an accommodation, the entity has an affirmative, mandatory duty to engage in a good-faith "Interactive Process" to identify a reasonable accommodation. *See E.E.O.C. v. Chevron Phillips Chem. Co., LP*, **570 F.3d 606, 621 (5th Cir. 2009).**

76. **The Breach of Duty**: Defendants received "Actual Notice" of Plaintiff's disability status on June 18, 2025. Rather than initiating the required interactive dialogue to adjust the "Math Trap" ($1,115 stagnant payment standard) to a life-sustaining level and visitation ability ($1,980 FMR), Defendants responded with administrative silence and technical "Shadow Advocacy."

62. **Deliberate Indifference**: By failing to engage in the interactive process while knowing the Plaintiff's disabilities, Defendants acted with "deliberate indifference" to Plaintiff's federally protected rights. This bad-faith refusal to communicate constitutes a standalone violation of the ADA and is the primary driver of the irreparable harm faced by Plaintiff and his daughter, Vivienne.

## XIII. CAUSES OF ACTION

**63. COUNT I: Violation of Title II of the ADA & Rehabilitation Act**

**64.** Defendants showed "deliberate indifference" to Plaintiff's respiratory disability and refused reasonable modifications to payment standards.

**65. COUNT II:** Fourteenth Amendment - Deprivation of Property (42 U.S.C. § 1983)

**66.** The $900 objective math error constitutes an unconstitutional taking of Plaintiff's limited disability income under color of state law.

**67. COUNT III: Violation of the Fair Housing Act (FHA)**

**68.** By applying a non-compliant $1,115 standard, Defendants made housing "unavailable" to a disabled veteran in violation of 42 U.S.C. § 3604(f).

**69. COUNT IV: Constructive Severance of Parental Rights**

**70.** Defendants' systemic negligence and "Administrative Warfare" unconstitutionally interfere with the family unit and the care of Vivienne Mueller.

## XIV. COUNT: FAILURE TO TRAIN (42 U.S.C. § 1983 / MONELL LIABILITY)

71. **The Commander's Principle:** It is a foundational principle of leadership that **"you get what you inspect, not what you expect."** As the Chief Executive of Harris County, the County Judge has a non-delegable duty to oversee the agencies and boards she appoints, including the Harris County Housing Authority (HCHA).

72. Under Fifth Circuit law, a municipality is liable if its failure to train employees amounts to "deliberate indifference" to the rights of inhabitants.

## 73. NEGLIGENT RETENTION OF UNFIT OFFICIALS

74. **The Tactical Basis:** This is a tort claim under Texas law. It argues that a supervisor kept someone in a position of power despite knowing they were incompetent or biased.

**75. The Argument:** The County Judge should have had "Actual Notice" (via prior filings and the 287-day silence in Case 4:25-cv-2377) that the HCHA leadership was refusing to engage in the ADA **Interactive Process** and was falsifying **SEMAP** data.

**76. The Breach:** Despite this notice of administrative malfeasance and "Active Hostility" toward a disabled veteran, the County Judge took zero corrective action to remove or discipline the officials responsible. This negligent retention allowed the "Math Trap" to persist, causing the **Constructive Severance** of Plaintiff's relationship with Vivienne.

## 77: NEPOTISM AND CRONYISM AS THE PROXIMATE CAUSE OF ADMINISTRATIVE COLLAPSE (42 U.S.C. § 1983)

**78. The "Cronyism" Theory of Liability:** Upon information and belief, and subject to the discovery process, Defendant Harris County, through the County Judge, appointed key leadership officials to the HCHA Board and executive staff based on personal relationships, political loyalty, or "cronyism," rather than professional qualification or expertise in HUD-VASH federal compliance.

**79. The "Big No-No's" of Federal Funding:** Under HUD regulations and the **Uniform Administrative Requirements (2 C.F.R. § 200.318)**, recipients of federal funds must maintain written standards of conduct covering **Conflicts of**

**Interest**. This includes the prohibition of appointing "friends" or "associates" to positions of oversight over $100M+ federal budgets without a transparent, merit-based process.

**80. The Link to Plaintiff's Harm:** This suspected "Friend-of-the-Judge" appointment resulted in a leadership vacuum where the HCHA was managed by individuals more concerned with political optics than the **90-110% Math Guardrails**.

**81. Discovery Target:** Plaintiff specifically seeks to discover:

**82.** All communications between the County Judge's office and HCHA leadership regarding the appointment process.

**83.** The resumes and "Conflict of Interest" disclosures of all HCHA Board members and the Director.

**84.** Evidence of whether these "friends" were prioritized over candidates with actual expertise in **TERA/PACT Act/HUD-VASH** housing requirements.

**85. The Proximate Cause:** Had the County Judge appointed a qualified, independent auditor instead of a "friend," the **$1,115 "Blanket Standard"** (a 56% departure from FMR) would have been flagged as a fraudulent cost-avoidance scheme. Further, an auditor could easily ascertain fraudulent SEMAP attestation.

Instead, the "friendship" created a culture of **Administrative Silence** that nearly cost a decorated Marine Captain his life and his relationship with his daughter.

## 86. COUNT X: STATE-CREATED DANGER (SUBSTANTIVE DUE PROCESS)

87. **The Tactical Basis:** This is a specialized Fourteenth Amendment claim used when the state's affirmative acts make an individual *more* vulnerable to a known danger.

88. **The Argument:** The County Judge and Harris County created a "Danger Zone" by funneling federal HUD-VASH funds into a "Blanket Standard" ($1,115) that they knew was 56% below market floor in high-opportunity areas.

89. **The Breach:** By forcing a veteran with a documented **TERA/PACT Act** profile into a financial and spatial "Math Trap" that prevents medical stabilization and visitation the County Judge affirmatively damaged the Plaintiff. Her "Administrative Inaction" in the face of **CMI (Chronic Multi-Symptom Illness)** constitutes a reckless disregard for human life and the import of a bond with your child.

90. **The Argument:** Defendant Harris County, through the County Judge, failed to ensure HCHA staff were trained on the **August 2024 HUD-VASH Operating**

Requirements (89 FR 65902), specifically the 140% Exception Payment Standard for disabled veterans.

91. The Breach: Because the County provided zero training on these new life-saving federal mandates, staff like Debra McCray defaulted to a stagnant, illegal $1,115 "Blanket Standard," directly resulting in Plaintiff's CMI (Chronic Multi-Symptom Illness).

92. The Lack of Oversight: Upon information and belief, Defendant Harris County, acting through the County Judge, has failed to conduct a single meaningful audit of the HCHA's payment standards or SEMAP certifications. 93.

93. There has been a total collapse of the chain of command:

> A. Zero Board Engagement: The County Judge has failed to meet with the HCHA Board or the Case Managers to address systemic veteran homelessness.
>
> B. Zero Financial Audits: The County has allowed the $1,115 "Blanket Standard" to persist across 60 zip codes without verifying its compliance with 24 C.F.R. § 982.503.

94. Deliberate Indifference to Oversight: This "hands-off" approach constitutes a policy of Deliberate Indifference to the constitutional rights of disabled veterans. By allowing the HCHA to operate as a "rogue agency" with no oversight,

the County created the environment where the **"Math Trap"** and the **"Clinical Mayday"** CMI (Chronic Multi-Symptom Illness) could occur without intervention.

**95. Dereliction of Duty:** This failure to supervise is the proximate cause of the **Constructive Severance** of Plaintiff's parental rights. Had the County Judge "inspected" what she "expected," the HCHA's fraudulent $1,115 stagnant rate would have been flagged and corrected long before it endangered the life of a decorated Captain and his daughter, Vivienne.

**96. NEPOTISM AND CRONYISM AS THE PROXIMATE CAUSE OF ADMINISTRATIVE COLLAPSE (42 U.S.C. § 1983)**

**97. The "SEMAP" Fraud (Falsifying Performance)**

**98.** HUD evaluates PHAs using the **Section 8 Management Assessment Program (SEMAP)**. One of the key indicators is **"Lease-Up Rate"** and **"Budget Utilization."**

**99. The Malfeasance:** If the HCHA tells HUD they are a "High Performer" but they are only spending $1,115 in a $1,980 market, they are "saving" money by making the vouchers **unusable**.

**100. The Result:** They keep the federal "Administrative Fees" (the money HUD

pays them to run the program) while failing to actually house the veterans. This is "predatory administration"—collecting a paycheck for a mission they are intentionally sabotaging.

---

**XV. The Link to Plaintiff's Harm:** This suspected "Friend-of-the-Judge" appointment resulted in a leadership vacuum where the HCHA was managed by individuals more concerned with political optics than the 90-110% Math Guardrails.

**101. Discovery Target:** Plaintiff specifically seeks to discover:

A. All communications between the County Judge's office and HCHA leadership regarding the appointment process.

B. The resumes and "Conflict of Interest" disclosures of all HCHA Board members and the Director.

C. Evidence of whether these "friends" were prioritized over candidates with actual expertise in **TERA/PACT Act** housing requirements.

**102. The Proximate Cause:** Had the County Judge appointed a qualified, independent auditor instead of a "friend," the **$1,115 "Blanket Standard"** (a 56% departure from FMR) would have been flagged as a fraudulent cost-avoidance

scheme. Instead, the "friendship" created a culture of **Administrative Silence** that nearly cost a decorated Marine Captain his life.

---

## XVI. BASIS FOR EMERGENCY PRELIMINARY INJUNCTIVE RELIEF

103. Plaintiff meets the four-part test for a Preliminary Injunction under **Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7 (2008)**

104. **Likelihood of Success on the Merits**: Plaintiff has provided objective, forensic proof that Defendants are violating 24 C.F.R. § 982.503 by enforcing a $1,115 "Blanket Standard" that is 56% below the HUD-mandated FMR. There is no legal defense for a mathematical departure of this magnitude.

105. **Irreparable Harm**: This is not a mere "monetary" dispute. Plaintiff has documented medical issues, some of which are still being evaluated, but there have been 3 seizures and 3 trips via ambulance to the Emergency Room. Without an immediate adjustment to the voucher to allow for a medically suitable environment, Plaintiff faces a high probability of cardiac arrest or permanent neurological damage. Furthermore, the Constructive Severance of the relationship with his daughter, Vivienne, constitutes irreparable constitutional harm that cannot be remedied by money alone.Balance of Equities: The "hardship" to the

Defendants is purely administrative and involves the correct allocation of federal HUD funds they already possess. The "hardship" to the Plaintiff is death or total physical collapse. The scale tips decisively in favor of the disabled Veteran.The Public Interest: It is strongly in the public interest to ensure that Harris County complies with federal housing laws and the PACT Act, and that a decorated Marine Captain is not left to die in a "Math Trap" due to administrative "Cronyism" and "Dereliction of Duty."

---

## XVII. EXHAUSTION OF ADMINISTRATIVE REMEDIES AND THE DOCTRINE OF FUTILITY

106. **The Requirement of Exhaustion:** While Defendants may argue that Plaintiff failed to exhaust internal HCHA grievance procedures, the Fifth Circuit recognizes that exhaustion is not required where such efforts would be "vividly futile" or where the administrative process is incapable of providing the requested relief. *See Honig v. Doe*, 484 U.S. 305 (1988).

107. **Actual Notice via Lawsuit #1:** Defendants received formal, actual notice of the life-safety crisis and the "Math Trap" during the pendency of Case No. 4:25-cv-2377. Despite 287 days of notice, Defendants chose a strategy of "Shadow Advocacy" and procedural silence rather than engaging in the HUD-mandated

**Interactive Process**. A lawsuit is the ultimate "Notice"; their failure to settle or adjust the voucher during that time proves administrative futility.

**108. The Reasonable Accommodation Letter:** On April 25, 2025, Plaintiff submitted a formal **Request for Reasonable Accommodation** to Defendant Debra McCray and the HCHA. This letter explicitly detailed Petitioner's disability and requested a move to comply with HUD regulations.

**109. The Direct Refusal:** Defendants issued a formal denial of this request. In said denial, Defendants admitted they were "legally mandated to honor 100% of the FMR," but affirmatively stated they would **not** do so. Furthermore and illegally, they failed to engage.

**110. Futility Established:** Because the HCHA operates under a "Blanket Standard" ($1,115) that is a matter of established County policy, no lower-level administrative hearing could override the Director's stated refusal to follow federal law. Having already attempted to resolve this through both a federal lawsuit and a formal accommodation request, Plaintiff has exhausted all viable remedies. Any further attempt at "internal appeals" would be a vain and useless act.

---

## XVIII. CONCLUSION: THE COST OF ADMINISTRATIVE

## ABANDONMENT

**111.** The evidence in this action demonstrates a catastrophic and systemic collapse of the "Housing First" mandate. Through a coordinated campaign of **Active Hostility, "Shadow Advocacy,"Fiscal Malfeasance, and Failure to Engage,** the Defendants have transformed a federal safety net into a "Math Trap" designed to exclude the very veterans it was built to protect.

**112.** The Defendants' actions and inactions have **materially damaged** Plaintiff Sean August Mueller in a manner that is both objective and nearly fatal. By enforcing a stagnant $1,115 "Blanket Standard" that represents only **56%** of the HUD-mandated Fair Market Rent, the Defendants did not merely commit a clerical error; they engaged in a deliberate misappropriation of federal funds. **Their Actions and Inactions were clearly systemic.**

**113.** Furthermore, the Defendants' "Administrative Warfare" has resulted in the **Constructive Severance** of the parent-child relationship between Plaintiff and his daughter, Vivienne. By weaponizing procedural silence and refusing the ADA **Interactive Process,** the Defendants have unconstitutionally prioritized their "High Performer" metrics over the fundamental liberty of family integrity and the physical survival of a PACT Act-protected Veteran.

---

## XIX. THE DOCTRINE OF CONTINUING VIOLATION AND THE RELEVANCY OF PRIOR NOTICE

114. **Pre-empting the Procedural Shield:** Defendants may seek to characterize Case No. 4:25-cv-2377 as a closed chapter or a "procedural irrelevancy." This is a legal fallacy. Under the Continuing Violation Doctrine, each day the Defendants maintain the illegal $1,115 "Math Trap" and refuse the **140% HUD-VASH Exception** constitutes a fresh and independent violation of the ADA and the Fair Housing Act.

115. **History as the Indicator of Performance:** In the military, it is a foundational principle that **"History is an indicator of future performance."** Case #1 serves as the evidentiary baseline for the Defendants' state of mind. It provided the Defendants with **287 days of Actual Notice** of Plaintiff's Actions and Inactions that have severely damaged Plaintiff. Defendants continue to behave as before - **Badly.**

116. **The Service Trap as Evidence of Bad Faith:** The "Shadow Advocacy" and tactical silence employed by Defendants in the prior action are not "impermissible facts"; they are direct evidence of **Reckless Indifference**. By choosing to "Hang Up" on a disabled Veteran rather than engaging in the **Interactive Process** mandated by federal law, the Defendants demonstrated a persistent pattern of

"Administrative Warfare" that continues into the present action.

**117. The Bridge to Accountability:** The facts of the previous litigation are germane because they prove that the Defendants' current refusal to fix the voucher is not a "mistake"—it is a **willful, calculated, and ongoing breach of duty (unsupervised by Hildalgo)** that has persisted through two years of litigation and into the **250th Anniversary of the U.S. Military.**

---

## XX. CONCLUSION: HOUSTON FLEET WEEK (**EXHIBIT M**)

The irony of the Defendants' 'Administrative Warfare' is further compounded by the upcoming Houston Fleet Week (April 2026). While the female Commanding Officer of the USS Kearsarge (LHD-3) (**Exhibit N**) prepares to present a Marine Mameluke Sword to Plaintiff's niece—a fellow Marine (to be commissioned in May)—on the very deck where Plaintiff served as TRAP CO. The Defendants continue to maintain a 'Math Trap' that has forced the commander of that historic legacy into a 600 sq. ft. 'Service Trap.' This refusal to honor the 140% HUD-VASH Exception doesn't just damage a veteran; it **dishonors the 250-year lineage** of service that Plaintiff's family continues to uphold. The Defendants' 'Reckless Indifference' threatens to deprive Plaintiff of the physical stability required to witness this historic passing of the sword—a loss of 'Family

Integrity' that no amount of money can ever restore.

Plaintiff Mueller is but one casualty of a broader "Rogue Agency" operation. For every day the HCHA and Harris County are permitted to ignore the **90-110% FMR mandates** and falsify their **SEMAP certifications**, countless other veterans—men and women who served with honor—are being pushed into homelessness and medical crisis by the very officials appointed to serve them. The "Cronyism" within the Harris County administration has created a "State-Created Danger" that is both widespread and ongoing.

**HCHA and Harris County must be held accountable.** The "Wall of Silence" must be breached, the "Math Trap" must be dismantled, and the dignity of the Veteran must be restored. Justice for Plaintiff is the first step in ensuring that "Housing First" is a reality, not a fraudulent certification on a County balance sheet.

---

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Sean August Mueller respectfully prays that this Court enter a judgment in his favor and against Defendants Harris County Housing Authority and Harris County, Texas, and award him the following relief:

Plaintiff requests:

## I.   EMERGENCY PRELIMINARY AND PERMANENT INJUNCTION:

An order directing Defendants to immediately correct the voucher payment standard for the 77027 zip code to at least **110% of the Fair Market Rent ($2,178)**, or the **140% Exception Standard ($2,772)** as authorized by the August 2024 HUD-VASH Update, to allow for medical stabilization.

An order enjoining Defendants from enforcing the illegal $1,115 "Blanket Standard" which violates the **90-110% mandate of 24 C.F.R. § 982.503**.

## II.   DECLARATORY JUDGMENT:

A formal declaration that the Defendants' "Math Trap," "Administrative Silence," and refusal to engage in the ADA **Interactive Process** while Plaintiff was in **CMI (Chronic Multi-Symptom Illness)** constitutes a violation of the Fair Housing Act, the ADA, and the Rehabilitation Act.

## III.   COMPENSATORY DAMAGES:

Plaintiff seeks compensatory damages in an amount to be proven at trial, including but not limited to:

- **Loss of Earning Capacity:** Damages for the profound and ongoing

loss of professional income and career trajectory caused by the Defendants' 'Administrative Warfare' and the resulting state of homelessness, which prevented Plaintiff from maintaining the professional standing and resources required for high-level executive employment.

- **Out-of-Pocket Losses:** Reimbursement for all costs incurred due to the Defendants' failure to provide a legally compliant housing subsidy.

## IV.    SYSTEMIC EQUITABLE REFORM:

An order requiring Defendant Harris County to conduct an **independent forensic audit** of all HCHA payment standards and hiring practices (addressing the "Cronyism" and "Failure to Supervise" counts).

Mandatory **ADA and HUD-VASH Compliance Training** for all HCHA staff and the Harris County Judge's oversight team, focusing on the August 2024 federal updates.

## V.    NOMINAL DAMAGES AND COSTS:

Nominal damages of $1.00 for the legal wrong committed, and an award of all reasonable costs associated with this litigation.

## VI.    OTHER RELIEF:

Such other and further relief as the Court deems just, equitable, and proper to restore the dignity and safety of a PACT Act-protected Veteran.

## XXI. JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**SEAN AUGUST MUELLER,** PRO SE

Captain, USMC, Honorable Discharge
Navy Unit Commendation for Heroism
(TRAP CO: Rescue of Capt. Scott O'Grady, Operation Deny Flight)

3333 Cummins St.
Apt 1621
Houston, TX 77027
832-726-4929